(45 South. 935.)

No. 16,607.

EXCHANGE BANK v. E. B. WILLIAMS & CO.

In re EXCHANGE BANK.

(June 21, 1907. On Rehearing, March 16, 1908.)

1. CONTRACTS—VALIDITY.

One may engage in a business transaction with his eyes closed if it pleases him, but, if no unfair advantage be taken, there is no reason why he should thereafter complain of a lack of information, which he might readily have obtained if he had kept his eyes open.

2. SALES—CONTRACTS—VALIDITY — MISREPRESENTATIONS.

Where one undertakes to transfer only the interest in particular property that he possesses, and the transferee is in a position to know as well as he the extent of that interest, and both parties act in good faith, the transferee has no just cause of complaint if the interest acquired by him proves to be less valuable than he expected.

(Syllabus by the Court.)

Certiorari to Court of Appeal, Parish of Orleans.

Action by the Exchange Bank against E. B. Williams & Co. Judgment for plaintiff, and defendant appeals to the Court of Appeal. Judgment reversed, and plaintiff applies for certiorari or writ of review. Denied, and judgment of Court of Appeal affirmed.

Rice & Montgomery, for applicant. Gustave Lemle and Pierson, Walton & Pierson, for respondent.

## Statement of the Case.

NICHOLLS, J. The plaintiff in this suit in its petition against the defendants, instituted in the civil district court for the parish of Orleans, asked for judgment in the sum of $1,436.95 with 10 per cent. interest from March 4, 1902, until paid. It alleged that:

"On or about February 13, 1902, E. B. Williams & Co., for value received, assigned, transferred, and set over unto the Exchange Bank of Friar's Point, Miss., all their certain claims and demands of every kind and description whatever against H. C. Buck, Jr., & Co., and also transferred, assigned, and set over and delivered unto said Exchange Bank all lumber owned by said E. B. Williams & Co. purchased of H. C. Buck, Jr., then at Boyle, Miss., all of which will more fully appear from said contract annexed and made part hereof, marked 'Exhibit A.'

"That in consideration of said transfer petitioner paid said E. B. Williams & Co., twenty-two hundred and forty-nine $35/100$ dollars ($2,-249.35), being $2,500 less certain agreed deductions.

"That further, on or about February 13, 1902, said Eugene B. Williams and Schuyler B. Coleman—copartner under the firm name of E. B. Williams & Co., New Orleans, La.—for value received, assigned, transferred, and made over unto the Exchange Bank of Friar's Point, Miss., petitioner herein, all the rights, title, and interest in and to all the cypress timber on a certain tract of land consisting of 160 acres, and described as S. W. ¼ of section 5, township 20, range 5, and lying north of Porter's Bayou in Sunflower county, Miss., and being the same standing timber purchased by H. C. Buck, Jr., & Co., of G. W. Faison, Sr., by deed dated October 28, 1901, and by H. C. Buck, Jr., & Co. transferred to E. B. Williams and Schuyler B. Coleman and E. B. Williams & Co., by deed dated November 1, 1901, said several deeds being recorded in the office of the clerk of the chancery court of said Sunflower county, in

Book J 2, page 149. And they further transferred, assigned, and made over to petitioner all rights of way and privileges to which said Eugene B. Williams and Schuyler B. Coleman and E. B. Williams & Co. were entitled under and by virtue of said several deeds; that said transfer was signed by said E. B. Williams & Co., by said Eugene B. Williams, and by said Schuyler B. Coleman, and acknowledged on, say, February 13, 1902, before Charles T. Soniat, Notary Public, in the parish of Orleans, state of Louisiana, all of which will more fully appear from said transfer hereto annexed and made part hereof, marked 'Exhibit B.'

"That, in consideration of said transfer, petitioner delivered to said E. B. Williams & Co. a promissory note, held and owned by petitioner, dated November 5, 1901, and drawn by said E. B. Williams & Co. in the full sum of two thousand dollars ($2,000) to the order of H. C. Buck, Jr., & Co., or bearer; maturing March 4th, 1902, and with 10% interest from maturity on account of which said note five hundred and sixty-three $05/100$ dollars ($563.05) had been paid, leaving fourteen hundred and thirty-six $95/100$ dollars ($1,436.95) due and owing at that time of said transfer.

"That on or about July 30, 1902, when petitioner attempted to move said standing timber out of brake, they were stopped by a deputy sheriff, and for the first time learned that said timber had been seized as the property of, and under attachment against, said H. C. Buck, Jr., & Co., and on investigation petitioner found that said E. B. Williams & Co. had not recorded the deed of sale of the said Faison brake from H. C. Buck, Jr., and Co., as required by the laws of Mississippi, until, say, January 17, 1902; almost three months after the deed of sale was made to E. B. Williams & Co., and that said attachment was levied on or about January 1, 1902, and that in due course said standing timber on the Faison land, purchased as stated by petitioner, on, say, February 13, 1902, was sold under the attachment some time in August, 1902; and in consequence there was no consideration on the part of E. B. Williams & Co., for the transfer and delivery of said note by petitioner to said E. B. Williams & Co.; that their only consideration of the transfer to E. B. Williams & Co., of said note was the standing timber on said Faison property, transferred to petitioner by said E. B. Williams & Co., under deed of February 13, 1902.

"That the fact that said E. B. Williams & Co., through their own fault, were not in a position, and could not deliver to petitioner said standing timber on said Faison property, was not known to petitioner; and that the fact that there was no consideration was due solely to the fault of said E. B. Williams & Co., and not to any fault on the part of petitioner; and that petitioner is entitled to the return of said note, but that, as said note is past due, petitioner is entitled to the amount of said note, fourteen hundred and thirty-six $95/100$ dollars ($1,436.95) together with 10% interest from maturity of said note March 4, 1902.

"That as soon as petitioner learned of the attachment and that said attachment seizing said standing timber on the Faison property sold by H. C. Buck, Jr., & Co. to E. B. Williams & Co. was good as against the said sale under the laws of Mississippi, by reason of the fact that the attachment was made before E. B. Williams & Co. recorded this deed of purchase, petitioner notified said E. B. Williams & Co., and made demand upon defendant to place petitioner in possession of said standing timber, or to pay petitioner the amount due on said note, together with interest, but that defendants refused to do either."

Defendants answered, first pleading the general issue. They then alleged that they admitted that they executed the assignments and relinquishments about February 13, 1902, annexed to the plaintiff's petition, but expressly denied that the surrender of the alleged note for $2,000 to them by said plaintiff formed or was any separate consideration, or the alleged assignment of the cypress timber by defendants to said plaintiff, but to the contrary, "the two assignments set forth are component parts of a single settlement and transaction, said transfer of said cypress timber was but the relinquishment by defendants of their rights and claims against H. C. Buck, Jr., & Co. to the plaintiff in settlement made through the plaintiff with H. C. Buck, Jr., & Co., under the contract of September 28, 1901, copy of which is annexed hereto and made part hereof, and of which contract the said plaintiff took cognizance and had notice from its inception."

Defendants show: That the said $2,000 note was executed by them pursuant to said annexed contract as an advance to H. C. Buck, Jr., & Co. on the price stipulated to be paid for the lumber in accordance with the stipulations of said contract, and upon the conditions, therein expressed, that said cypress timber should be transferred to defendants as collateral security against loss on account of the issuance of said note, all of which said plaintiff at the time took cognizance and had notice of. That said bank, by correspondence with defendants, co-operated

with and assisted said H. C. Buck, Jr., & Co. in the obtention of said $2,000 note from defendants, and co-operated with and assisted said Buck & Co. in complying with the conditions upon which defendants executed said note, and under which it was delivered by them to the said bank for and at the instance of H. C. Buck, Jr., & Co.

"That said bank received said note from defendants with full notice of the purpose and conditions under which it was issued, and with full notice that the transfer of the said cypress timber from said H. C. Buck, Jr., & Co. to them was to secure defendants against loss under said note in the event said Buck, Jr., & Co. should neglect or fail to manufacture and deliver said lumber to them under said contract, and that defendants held said transfer of said cypress timber as collateral security against loss on account of said note. Defendants aver that H. C. Buck, Jr., & Co. failed to comply with said contract, and failed to manufacture or deliver said lumber to defendants within the time specified or according to said contract; that said H. C. Buck, Jr., & Co., long after the time specified, tardily manufactured and delivered to defendants under said contract only 60,580 ft. of the grade of 1sts and 2nds, 52,526 ft. of grade of selects, and 33,467 ft. of the grade of shops, as exhibited by the itemized statement of same, hereto annexed and made part hereof, all of which defendants had on hand at Boyle, Miss., in January and February, 1902, ready for sale and shipment.

"That they negotiated the sale of said lumber to Crandall & Richardson in Chicago at the prices stipulated in the annexed statement of said lumber, and under which they would have received for said lumber net the sum of $3,060.93 or more, which would have resulted in a net profit on said lot of lumber to them of $672.72 had they not been wrongfully prevented by said H. C. Buck, Jr., & Co. from obtaining cars and facilities for shipping same out to said Crandall & Richardson in Chicago. Defendants, from information received long after September, 1901, aver that said H. C. Buck, Jr., & Co. was none other than H. C. Buck, Jr., who is a brother-in-law of J. O. Lamkin, the cashier of the plaintiff bank in this case. That said Buck, Jr., & Co., with the co-operation of said plaintiff after the delivery of the above lumber to these defendants, and after the sale by them to Crandall & Richardson had been negotiated by suggestions of threatened litigation upon unfounded claims, and of the institution by H. C. Buck, Jr., & Co. of bankruptcy proceedings and other undue influences, sought to coerce and influence defendants to transfer said lumber with all their rights under said contract to said plaintiff bank, and, as defendants believe, to enable said bank to reap the said profits from the sale of said lumber to said Crandall & Richardson, arising to them as above set forth. That said bank, through its said cashier, wrote letters to defendants to influence them to give up their said prospective profits, and to transfer their rights and claims, including said lumber, to said bank; that said bank wrote these defendants among other things through its cashier, the following: 'We will refund you the amount advanced to Mr. Buck on cypress and the amount you have paid on the $2,000.00 note, and let you out without loss. You to assign to us bill of sale on Shaw brake (referring to the cypress timber), and make bill of sale to us for the cypress lumber you have advanced on at Boyle, and assign lease to ground on which it is piled in case you have lease.'

"That said H. C. Buck, Jr., & Co., to coerce defendants to enter into said settlement and transaction which would release Buck & Co. from the said contract of September 28, 1901, and transfer the profits on the sale of said lumber to Crandall & Richardson to the bank, interfered with defendants in their efforts to ship out said lumber for delivery to Crandall & Richardson, and used influences to wrongfully prevent defendants from obtaining cars to ship out said lumber in the time limited for delivery to Crandall & Richardson at Chicago."

After cars had been refused them by the railroad authorities under the influence of H. C. Buck, Jr., & Co. these defendants, much against their free will and against their interest, were compelled to accept the said bank's terms, and to settle with it for said Buck, Jr., & Co., on the basis of $2,500, subject to certain deductions therefrom, reducing the sum to about $2,250, and defendants were compelled to turn over the said lumber to the said bank for shipment to said Crandall & Richardson, and to surrender to it the profits they would have received. Under the settlement, all matters and things between defendants and H. C. Buck, Jr., & Co. were included, the said note of $2,000 was returned to defendants, and the said balance agreed on was paid by the bank to defendants, who, in consideration thereof, made the two assignments to said bank in relinquishment of their rights and claims. Defendants aver that the real purpose of said assignments to said bank was to effect settlement with H. C. Buck, Jr., & Co., on whose behalf the said bank was acting, and that the assignment of the said cypress timber

and relinquishment to the bank was made at the instance of said H. C. Buck, Jr., & Co. and with his consent, and was assigned along with and as incidental to the said contract of September 29, 1901, with said H. C. Buck, Jr., & Co., and as part of it. That the real consideration for said transfers to said bank was the said lumber and contract, and that said timber was assigned as part thereof and merely as collateral to the same, and no separate consideration was given or paid therefor; that said bank sold the lumber at a profit over and above the consideration paid to defendants therefor, and that defendants are not indebted to said bank for or on account of said settlement or said transfers.

"In view of the premises defendants pray that said plaintiff's demand be rejected, and that this suit be dismissed, and for costs and general relief."

Defendants annexed to their answer the contract between themselves and Buck & Co., the contract of the 13th of September, and the itemized accounts referred to therein. The district court rendered judgment in favor of the plaintiff and against the defendants as prayed for, and defendants appealed to the Court of Appeal for the parish of Orleans. Two judgments were rendered by that court. In the first judgment, that of the district court was affirmed, but, on a rehearing, it set aside its own judgment, and reversed the judgment of the district court. That judgment has been brought before us for review. Judge Dufour was the organ of the Court of Appeal in rendering the first judgment. He prefaced that judgment by a statement of fact which we do not understand to be disputed as incorrect. We make the following extracts from the judgment:

"H. C. Buck, Jr., doing business under the name of H. C. Buck, Jr., & Co., was, in September, 1901, operating a sawmill at Boyle, Miss., which he had purchased from the Exchange Bank of Friars Point, but for which he had not paid.

"On September 28, 1901, Buck entered into a written contract with Williams & Co. to deliver them in specified grades and dimensions five hundred thousand feet of cypress lumber, half by December 1, 1901, and half by February 1, 1902.

"The contract contained a provision that 'Buck & Co. will furnish satisfactory guarantee as to clear title to cypress stumpage purchased, and a satisfactory showing as to the quality and amount of the said cypress stumpage.'

"Williams & Co. also agreed to issue 'their four months' note for $2,000, against which Buck & Co. agreed to furnish bill of sale in proper form of a certain lot of cypress timber estimated by them at 1,500,000 feet merchantable timber, Buck & Co. agreed that on the purchase price of said lumber there shall be four dollars per M. deducted from the price to be paid by Williams & Co. for the above lumber which will be applied on the above $2,000 note.'

"On October 5, Lamkin, cashier of the bank, at Buck's request, wrote to defendants that from information received he believed that the brake was well worth the price which Buck was to pay with the money to be furnished by Williams & Co.

"On October 7th, the defendants wrote to Lamkin as follows:

"'We have a contract with Mr. Buck, and it was understood that you, as cashier, were to guarantee to us that there were no incumbrances on the cypress brake in question, and that there was at least one and one-half million feet merchantable standing timber on same, all accessible to the mill at which Mr. Buck proposes to saw it up into lumber.'

"To which Lamkin replied: 'The information was collected by me and given to you as received by me, and is, I believe, correct. But I do not undertake to guarantee anything or to assume any responsibility whatever in the matter.'

"Some time elapsed before the transaction was consummated, owing to errors and imperfections in the papers forwarded between the parties, but the note was signed on November 5th.

"Complete refutation of defendants' claim that they acted on the bank's assurance is to be found in the following letter to Buck: 'We have asked our Mr. Simpson to look into the matter of timber, and though he claims that there is much less timber than you represented at the same time he is satisfied there will be sufficient to get our contract of 500 M. ft.'

"The Exchange Bank discounted the note in question, and placed the proceeds to the credit of Buck & Co., who checked out the amount. At the time the note was surrendered to defendants by the bank there had been payments on account thereof, to the extent of $563.05.

"About the middle of January, 1902, Buck's affairs appear to have become embarrassed to such an extent that Lamkin, to protect the bank's interest, made a trip to Boyle to investigate matters.

"In a letter of January 18th to defendants he says:

"'I have been at Boyle for several days at mill of Buck, Jr., & Co., and found matters in a

very bad shape. We are interested to considerable extent down there, and Buck is heavily involved with local parties.

"'I have been endeavoring to hold matters in check, and have time to adjust his affairs without resort to litigation. We wish to get everything there under our control and save what we can. I wish to make you this proposition. We will refund you the amount advanced to Mr. Buck on cypress and the amount you have paid on the $2,000 note, and let you out without loss, you to assign to us bill sale on Shaw brake, and make bill of sale to us for the cypress lumber you have advanced on at Boyle, and assign lease to ground on which it is piled in case you have lease. Your refusal to accept this proposition will leave the matter in this shape: A large amount of logs which have been sawed into cypress have not been paid for, and these parties will cause you trouble if not settled with. We will force collection of balance due on the $2,000 note of yours that we hold, and you will be involved in expensive and vexatious litigation. Mr. Buck cannot operate the mill under present conditions; and, unless you are willing to take what you have put in there and get out, we cannot control situation, and he (Buck) will be forced into bankruptcy. Wire us whether or not you will be willing to do this. If you accept, draw on us for advances made on cypress, and what you have paid on $2,000 note with papers referred to, and have attached an inventory of cypress lumber, as per your inspector's reports.'

"It is immaterial to inquire whether there was a single transaction or two distinct ones.

"It is clear that the purpose of the agreement resulting from the acceptance of the foregoing proposition was, on the one hand, to allow the plaintiff for its own protection to control the situation in reference to Buck's affairs, and, on the other, to allow the defendants to withdraw from their engagement without loss to themselves.

"The bank kept faith and carried out its obligations to the letter; it paid the sum agreed upon, returned the note in question, and obtained from Crandall & Richardson a release from the contract with Williams. To bring about that result it surrendered to Crandall & Richardson some of its own oak timber over and above the timber included in the original contract with Williams & Co.

"The latter's claim that they have not been made whole, as they lost their profits on the Crandall & Richardson contract, is an evident afterthought, apparently provoked by the exigencies of this suit. Buck's default, if not remedied by the bank would have made it impossible for them to comply with their obligations, and they admit that 'while we are losing the profits, we are satisfied to be relieved of any damage claim on the part of Crandall & Richardson, for nondelivery according to the contract.'

"The fundamental error of defendants' theory is the unwarranted assumption that the bank was, in any manner and at any time, acting for Buck; it acted for itself, in the protection of its own interest, and it was an absolute stranger to the contract between Buck and Williams & Co. The charge is groundless that the bank assisted or instigated Buck in his actions, or had anything to do with causing the refusal of car facilities.

"The sole cause of the injury herein is found in the failure of defendants to seasonably record the deed to the brake and timber and in thus allowing a subsequent creditor of Buck to secure a priority thereon by attachment under the law of Mississippi.

"It was their plain duty under their agreement to turn over to the bank the security in the same unimpaired and unincumbered condition as when they received it from Buck. Had they done so, no injury would have occurred.

"Although defendants have come out without loss, so far as plaintiff's conduct is concerned, their negligence in the discharge of their contractual obligations have entailed a loss on the latter which they must be repaid. There is no force in the contention that plaintiff should have made an effort to minimize the loss by buying out or paying off the attaching creditor, when it appears that defendants with full knowledge of all the circumstances declined to take any steps in the like direction. The defenses urged are not in accord with the judicial conception of fair dealing and cannot be sustained. The syllabus of the second judgment explains the ultimate conclusions of the Court of Appeal as follows:

"A. executed and delivered to B. his accommodation note for the use of the latter, and in order to protect A. from loss in the event the latter should have to pay the note, B. executed to A. a deed, in the form of a sale of certain property, the deed reciting, however, the fact that it was intended by the parties only as security for the purpose stated. B. discounted the note in a bank which was fully aware of all the facts connected with the transaction. Subsequently B. became involved in debt, and the bank being its largest creditor sought to get control of B.'s business so as to enable it to save what it could on B.'s indebtedness to it, and to that end proposed to A., who was in business relations with B., that, if A. would 'get out,' it (the bank) would 'let him out without loss,' if A. would accept from the bank all the money he had advanced to B. in the business—which was the lumber business—and the return to him of his accommodation note which he had loaned to B., and which the bank held; if A., on his part, would assign to the bank the deed aforesaid, and a certain lease of land on which lumber was stored, and make to the bank a sale of the lumber thereon. This proposition was accepted by A., and was duly carried out by both parties.

"The accommodation note was canceled and returned to A. and he was refunded what he had advanced to B.; the deed securing A. against loss in the event he had to pay the note was assigned to the bank, and the other engagements of A. fulfilled.

"The deed guaranteeing A. against loss on the note was not recorded, and creditors of B.

seized the property covered by the deed, sold it, and applied the proceeds of sale to their judgment.

"Thereupon the bank sued A. for the amount which was due on the accommodation note given to B. at the time it was surrendered by the bank to A., basing its demand on the ground that, had the deed from B. to A. been seasonably recorded, the property covered thereby could not have been seized and sold, and that if it had been the bank would have been preferred out of the proceeds of sale to the amount due on the note.

"Held: That as the deed was one of security, not of sale, and was intended and declared to be solely for the purpose of protecting and guaranteeing A. against loss in the event he should have to pay the note, it was personal to A., and gave him no right which was transferable to a third person, and which could serve as a security for the debts due by B. to that other person. That the security became uneffectual the moment the obligation it was intended to secure no longer existed, and that, hence, registry of the act could not have benefited the bank, and, consequently, its nonregistry could not have injured it. That when the bank surrendered the note to A., the maker, all rights which he had under the deed fell. It could no longer serve as security to A. for the note which was surrendered to him, nor for any other of B.'s obligations to him, and still less for any debt of B. to the bank, or to any one else, whether the deed was recorded or not—assuredly not to the bank for a note which it had surrendered to the maker for value, and where it is not pretended that the note was obtained by fraud, deceit, or misrepresentation on the part of the maker.

"Former opinion and decree recalled, and judgment appealed from reversed. Dufour, J., dissents, for the reasons assigned in the former opinion."

### Opinion.

The $2,000 note referred to in this litigation was one executed as makers by Williams & Co. as part of the price of certain lumber which Buck, Jr., & Co. had agreed to sell to them. It was given by anticipation, but in the expectation, that Buck would comply with their obligations under their contract. The note was a negotiable instrument payable to H. C. Buck & Co., or bearer, maturing March 4, 1902. Defendants had the right, at their risk, to execute and deliver the note to Buck & Co. (Sadler v. White, 14 La. Ann. 177), who it seems needed money to assist them in executing their contract with defendants. Having been given the note,

Buck, Jr., & Co. discounted it with the plaintiff bank. Aware of the fact that Buck, Jr., & Co. might fail to carry out their contract, defendants (with the object of aiding Buck, and, also, protecting themselves from loss from the issuing of their notes) took an assignment from them to certain growing timber (referred to in the proceedings as "Faison brake"), which they purchased with the intent of sawing it up and supplying the lumber as contracted for with defendants. When the bank discounted the note, defendants and Buck & Co. became its debtors. It was no party to the contract between plaintiff and defendants, and in no manner bound by its terms. The bank evidently had dealings with Buck & Co. independently of this particular transaction. Buck, Jr., & Co.'s affairs became greatly embarrassed, and it became evident to the bank that it was required to take steps to protect its interests in the premises. For that purpose it made to the defendants the proposition alleged in the pleadings, and which is discussed in the judgments of the district court and the Court of Appeal. Defendants accepted it. It was beyond question the bank's hope and belief that through the conveyance made to it by defendants of the assignment which Buck, Jr., & Co. has made to them of the Faison brake, it could successfully control the situation as against the creditors of Buck & Co. It acted under the belief evidently that the assignment to the defendants of the Faison brake had been recorded in time to have accomplished that result, but in point of fact it was not so recorded, and creditors of Buck & Co. seized the timber to the breaking up of plaintiff's plans. As part of these plans, plaintiffs purchased the lumber which Buck & Co. had sold and delivered to defendants. Some complications arose out of the latter purchase by reason of the fact that defendants had themselves entered into engagements in respect to that lumber with a Chicago firm which were likely to

embarrass the situation. To settle matters, the bank purchased that lumber, and made arrangements with that firm which required the bank to transfer to it some of its own lumber. The bank does not complain of the result of that branch of their arrangement with the defendants. It should have been mentioned that several hundred dollars had been paid to Buck, Jr., & Co. by the defendants, as the latter, from time to time, had delivered lumber to them. These amounts had been turned over to the bank and applied by it, pro tanto, to the payment of the note. Under its arrangement with defendants the bank paid back these amounts to defendants, and (after the assignment by the latter of the "Faison brake") the note was surrendered by the bank to them. The legal positions taken by the parties and the district court and the Court of Appeal appear from the pleadings and the judgments.

It is not denied, we think, that the transfer to the bank would have accomplished the purpose the bank had in view in taking the assignment from Buck, Jr., & Co. to defendants had the act been recorded at once, nor that the effect of the nonrecording was to permit the creditors of Buck, Jr., & Co. to break up and destroy all of the bank's expectations in the premises. Had matters been left as they were, defendants would have accomplished nothing themselves from the assignment of the brake to them by Buck & Co. Under such circumstances they would have been still bound to the bank to the extent of the unpaid portion of the note. Defendants and Buck & Co. being both debtors of the bank upon the note, and defendants having obtained (to protect themselves) a counter surety from Buck & Co. (who in reality owed the debt), they had the right to make (at the request of the bank) the act of counter suretyship inure to the benefit of the bank through an assignment of the same, and by doing so be released. We do not think it was the purpose of any of the parties to release Buck & Co. from their obligations on the note to the bank. Buck & Co. were evidently insolvent and threatened with bankruptcy, and had and have no interest in this matter really. There was no fraud whatever on the part of the defendants. They acted in perfect good faith. The assignment to the bank was not of their seeking, but was made at plaintiffs' own solicitation. The bank has evidently received no consideration for the release of the defendants, and it evidently acted in error of fact as to the timely recording of the act of assignment from Buck & Co. to them. The question is, has the bank the right to recover from the defendants the unpaid balance due upon the note as if the assignment to it had not been made, under the present condition of affairs?

The situation existing at the time of the assignment of the Faison brake by Buck & Co. to the defendants shows that the parties are before the court with all the equities in favor of the plaintiff bank. It is seeking to escape a loss, while the defendant is seeking to obtain a gain. The release of the defendants by the plaintiffs was made by the former in error; the motive and purpose which lay behind. Plaintiff's offer to release them was evidence and was known to the defendants. The object in view failed by reason of the inaction of the defendants, and not having the assignment of the brake to it recorded at the proper time. As between the plaintiff and the defendants, we think the result of that failure should fall on the latter. They will have lost nothing, but have been released from serious complications which doubtless would have followed from the inability of Buck & Co. to have executed their contract with them.

We are of the opinion that the judgment

of the Court of Appeal brought up for review is erroneous.

For the reasons herein assigned, it is hereby annulled, avoided, and reversed, and the judgment of the district court appealed to the Court of Appeal is hereby affirmed and reinstated. Costs of the district court and of the Court of Appeal and of this court to be borne by the defendants.

### On Rehearing.

MONROE, J. The facts material to the decision of the case here presented may be restated as follows, to wit:

H. C. Buck, Jr., doing business in the name of H. C. Buck, Jr., & Co., operated a sawmill at Boyle, Miss., and was in debt to the Exchange Bank of Friar's Point, Miss., and others. On September 28, 1901, he and E. B. Williams & Co. negotiated a contract (all the conditions of which were not finally agreed on until some time later) to the following effect, viz., that he should deliver to Williams & Co. 500,000 feet of cypress lumber at Boyle; that, in order to supply him with the money needed for the purchase of certain standing timber, constituting what is called the "Faison" (or "Shaw") brake, Williams & Co. should furnish their note for $2,000, payable in four months, and, to secure them against loss with respect thereto, that Buck should transfer to them the bill of sale of the brake in question; that, from the payments to be made for the lumber, there should be deducted $4 per 1,000 feet, which should be credited on the note; that Williams & Co. should estimate the lumber as manufactured and piled every two weeks, and should give their 90-day notes in payment therefor, to the extent of 80 per cent. of the price, after the deduction of the $4 per 1,000 feet heretofore mentioned, and that, upon the shipment of the lumber, they should pay the price, in full, in cash, such payments to be applied in reduction of any outstanding notes given by them, due or not due; and there was a further agreement whereby Buck & Co. leased to Williams & Co. the land upon which the lumber contracted for was to be piled. In accordance with the contract so made, Williams & Co., in November, 1901, furnished their note for $2,000, which was discounted by the plaintiff bank for account of Buck & Co., and the proceeds of which were used by that firm; and Buck & Co., who held a bill of sale, from one Faison, of the timber standing in the Faison brake, delivered the same to Williams & Co., together with, an instrument, executed upon a separate piece of paper, and reading (so far as it need be here quoted) as follows:

"We hereby transfer to E. B. Williams & Co. all our right and title in timber specified in bill of sale attached. This transfer is made to secure them in the issuance of their four months' promissory note for $2,000, and, if the same is taken care of, as per contract now in force, then this instrument to be null and void. [Signed] H. C. Buck, Jr., & Co."

This instrument was not recorded until January 17, 1902, and the clerk of the court, being examined as a witness, says:

"Said instrument is acknowledged by the subscribing witness, and was filed for record January 17, 1902. No land is described in the record of this instrument, and no record of the bill of sale attached, as referred to in said instrument."

As a matter of fact, the bill of sale (from Faison to Buck) was recorded on the same day as the transfer, but, as the clerk says, there is nothing to show that the two are identified with each other, and there is nothing in the instrument of transfer which identifies any property whatever. In the meanwhile—that is to say, on December 31, 1901 (prior to the recording of either of the documents mentioned)—the timber in question was seized under a writ of attachment issued from the circuit court of Sunflower county, on a claim of A. S. Caldwell against

H. C. Buck for $577.50 and costs, upon which plaintiff obtained judgment in April, 1902, in satisfaction of which the timber was sold in August, 1902, for the sum of $385. In the meanwhile, also—that is to say, on January 18, 1902—the cashier of the plaintiff bank wrote to Williams & Co. as follows:

"I have been at Boyle for several days at mill of H. C. Buck, Jr., & Co., and find matters in very bad shape. We are interested to considerable extent there, and Mr. Buck is heavily involved with local parties. I have been endeavoring to hold matters in check, and have tried to adjust his affairs without resort to litigation. We wish to get everything there under control and save what we can. I wish to make you this proposition: We will refund you the amount advanced to Mr. Buck on cypress and amount you have paid on the $2,000 note, and let you out without loss. You to assign us bill of sale on Shaw brake, and make bill of sale to us for cypress lumber you have advanced on at Boyle, and assign lease of ground on which it is placed, if you have lease."

The cashier's representations as to Buck's condition were fully authorized by the facts, as defendant's agent, who was on the spot, testifies that he owed money in every direction, and it is shown that among others he owed a debt of some $800 to one party from whom he had bought the cypress timber out of which he had manufactured at least part of his lumber; that the vendor was threatening to seize the lumber; and that others were threatening personal violence.

Of the cypress lumber (for which defendant held bills of sale) there appears to have been on hand about 140,000 feet, and there was about 110,000 feet of oak lumber, for which the bank held bills of sale. On the other hand, defendants had made a contract with Crandall & Richardson of Chicago, whereby they had agreed to deliver to that firm 250,000 feet of cypress lumber, which they were relying on Buck & Co. to supply, and which, it is quite evident, he would not have been able to supply. Before the proposition made by the bank could be accepted,

therefore, or, rather, before it could be placed on a basis that would let defendant out without loss, it became necessary to dispose of the Crandall & Richardson contract, and in order to arrange that Buck went to Chicago, and, after some negotiations (participated in by Crandall & Richardson, the bank, and himself), it was agreed that the contract should be executed by the bank's furnishing its oak lumber to supply the shortage in cypress; and thereupon defendants accepted the bank's offer to them, the understanding being that they were to be paid $2,500 in reimbursement of moneys expended in connection with their contract with Buck & Co., which amount, reduced by certain adjustments to $2,249.35, was duly paid—part of the payment consisting of the surrender by the bank of defendant's note for $2,000, upon which there was due a balance of $1,436.95 ($563.05 having been paid, on account, in the manner provided for by the contract with Buck & Co.). Defendants, on their part, gave up the 140,000 feet of cypress lumber, and transferred to the bank the lease of the land upon which it was piled. They also (on February 13, 1902) executed a written instrument reading, in part, as follows, to wit:

"For value received, we * * * do hereby assign, transfer, and make over unto the Exchange Bank, of Friar's Point, Miss., all our right, title, and interest in and to all the cypress timber on a certain tract of land, * * * being the same purchased by H. C. Buck, Jr., & Co. of G. W. Faison, * * * and by H. C. Buck, Jr., & Co., transferred to us by deed dated November 1, 1901. Said several deeds being recorded in the office of the clerk of the chancery court of said Sunflower county in Book J 2, p. 149," etc.

The evidence shows beyond question that Buck interposed in the matter, and that whilst defendants acquired the bill of sale merely to secure them against eventual liability for the amount represented by their note, and hence were originally authorized to use it only for that purpose, they were not

only authorized under the arrangement as thus made to transfer it to the bank, but were authorized to vest in the bank such title as Buck & Co., or they, or both, had in the timber. The bank, in executing the contract with Crandall & Richardson, obtained (net) $2,684.59 for the lumber turned over to it by defendant, so that, leaving the timber brake out of the calculation, it makes a profit, on its contract with defendants of, say, $184.59. The bill of sale from Faison to Buck & Co., and the transfer from Buck & Co. to defendants, passed through the hands of the bank whilst they were in process of execution, and the bank had as fair an opportunity as did the defendants of becoming informed of the fact that the transfer did not identify the bill of sale or the property to which the bill refers, and that neither the bill nor the transfer had been recorded until the day preceding that on which the offer to defendants was made. Moreover, it will be remembered that, in making his offer in behalf of the bank, the cashier wrote: "I have been at Boyle for several days, at mill of H. C. Buck, Jr., & Co."—from which it appears that he was on the spot, in intimate association with Buck, between whom and himself, as it happens, there is a family connection, within a few weeks after Caldwell's attachment had been levied, and was in a better position to become informed of that fact than were the defendants, who were in New Orleans. Considering the case as thus presented, and though we are still satisfied that both litigants acted in good faith, we are now of opinion that the law does not require it, and that it would be inequitable to impose a loss upon the defendants in order that the plaintiff should make an additional profit. The proposition that the bank made, and defendants accepted, must be taken as a whole. The bank offered, say, $2,500 for the cypress lumber held by defendants, the transfer of the lease,

and the bill of sale of the timber. The lumber and the leased premises were delivered to it, and it sold the former for $2,684.59. Defendants also conveyed to the bank all their right, title, and interest in and to the timber, and, if it was believed that their interest was greater than it really was, the error was one in which they shared; was partly of law and partly of fact; and was no more of their making than of the bank's. As it appears to us from examination of the originals in the record, and from the testimony of the clerk of the chancery court of Sunflower county, the bill of sale from Faison to Buck & Co., and the instrument by which Buck & Co. undertook to transfer the timber therein conveyed to defendants, have no physical connection, and are not otherwise identified with each other, so that if the instrument had been recorded before the attachment it would have accomplished nothing in the way of protecting the timber from seizure at the suit of Buck's creditors. The bank does not therefore appear to have been injured by the nonregistry complained of.

It is a fact that the conveyance executed by defendants contains the recital that the deeds from Faison to Buck & Co. and Buck & Co. to them had been recorded. But the recital was true, and even if such recording could have protected the timber, if the bank was unaware that it had not been done until January 17, 1902, its ignorance was inexcusable, since, as we understand it, the documents were delivered to it, and they have the date upon which they were recorded conspicuously inscribed upon their backs, together with the volume and folios in and upon which the record is made. It is said that the bank did not know that there had been an attachment levied, but it is not pretended that defendants had any such knowledge; and as they undertook in good faith to convey to the bank only such interest in the

property as they possessed, if that interest proved to be less valuable than the bank expected, it was not their fault, but the fault of the bank, which, as we have said, was quite as well informed upon the subject as were the defendants, and, having its domicile in Mississippi, being presumably more familiar with the laws of that state than defendants, and having immediately before submitting its proposition, through its cashier, made an investigation on the spot, was in a position to be better informed. If, knowing, or being in a position to know, that the interest of the defendants might have been partially or wholly devested by an attachment or an execution against Buck, the bank chose to act with its eyes closed, it was at liberty to do so, but there is no reason why it should now complain of a lack of information which it might readily have obtained if it had kept its eyes open. If it be true (and the cashier so testifies, and we do not doubt it) that the cypress brake was worth $1,500, then, as the lumber which was turned over to it was actually sold for $2,684.59, the bank expected to get $4,184.59 worth of property for $2,500. Even as the matter stood, the interest in the brake, which the defendants conveyed, represented the whole value of the brake, less the incumbrance resulting from the attachment (for, say, $577), or something over $900, and it was open to the bank to have realized that amount by making a temporary advance for the payment of the claim of the attaching creditor. But that it did not choose to do, and we do not think that the obligation to take such action vested in the defendants, who had conveyed their interest, and were called on to do no more.

It is therefore ordered, adjudged, and decreed that the prayer of the applicant herein be denied, that the judgment of the Court of Appeal remain undisturbed, and that this proceeding be dismissed, the applicant to pay the costs.